1

2

3

4

5

6

7

8

9

10

11

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

12  LISA DAVIS,                                    CASE NO. 1:10-cv-02372-LJO-SKO

13                        Plaintiff,

**FINDINGS AND RECOMMENDATIONS**
14        v.                                       **THAT PLAINTIFF'S MOTION FOR**
**CONDITIONAL CLASS**
15                                                 **CERTIFICATION BE DENIED**
**WITHOUT PREJUDICE**
16  SOCIAL   SERVICE   COORDINATORS,
INC., et al.,                                      **(Doc. 47)**
17
                        Defendants.                **OBJECTIONS DUE:  21 DAYS**
18  _____/

19

20                    **I.   INTRODUCTION**

21        Plaintiff Lisa Davis ("Plaintiff") filed suit against Social Service Coordinators, Inc. and

22  Social Services Coordinators, LLC (collectively "SSC") on December 20, 2010, alleging, *inter alia*,

23  that SSC failed to pay overtime wages in violation of the Fair Labor and Standards Act ("FLSA"),

24  codified at 29 U.S.C. § 201, et seq.  Following several motions, a Second Amended Complaint

25  ("SAC") was filed on August 11, 2011, which is the operative complaint.[1]  (Doc. 27.)

26

27  _____

28        [1] SSC filed a motion to dismiss Plaintiff's First Amended Complaint on February 8, 2011; SSC filed a motion
to strike Plaintiff's Second Amended Complaint on March 30, 2011; Plaintiff filed a Motion to Amend her First Amended
Complaint on April 20, 2011.  (*See* Docs. 11, 16, 18.)

1   On April 30, 2012, Plaintiff filed a motion to conditionally certify a collective action pursuant

2   to the FLSA. (Doc. 47.) On May 31, 2012, an opposition was filed by SSC. (Doc. 51.) Plaintiff

3   filed a reply brief on June 15, 2012. (Doc. 59.) On July 18, 2012, the parties appeared

4   telephonically for a hearing before U.S. Magistrate Judge Sheila K. Oberto. (Doc. 66.) Craig M.

5   Nicholas, Esq., appeared on behalf of Plaintiff and Christian C. Antkowiak, Esq., appeared on behalf

6   of SSC. (Doc. 66.)

7   For the reasons set forth below, the Court RECOMMENDS that Plaintiff's motion for

8   conditional certification of a collective action be DENIED WITHOUT PREJUDICE.

9   ## II.   BACKGROUND

10   SSC[2] is a private social service organization that contacts Medicare and Medicaid

11   beneficiaries across the nation seeking to qualify these beneficiaries for particular benefit programs

12   geared toward low-income applicants. (SAC, Doc. 27, ¶ 6.) Plaintiff worked as a remote case

13   manager for SSC from August 23, 2010, through November 25, 2010. (SAC, Doc. 27, ¶ 11.) As

14   a remote case manager, Plaintiff's principal and primary job duties included making telephone calls

15   to predetermined senior citizens within particular Medicare plans from a list provided by SSC.

16   (SAC, Doc. 27, ¶ 12.) Plaintiff was required and expected to interview and qualify the senior

17   citizens, pursuant to SSC's strict guidelines and scripts, for a particular Medicare plan. (SAC, Doc.

18   27, ¶ 12.) Plaintiff's work as a remote case manager was to make, on a daily basis, quota-based

19   telephone calls in accordance with the management decisions and business policies established by

20   SSC. (SAC, Doc. 27, ¶ 12.) Plaintiff was also required to process the applications for the applicable

21   benefits program. (SAC, Doc. 27, ¶ 13.) Plaintiff alleges her position as remote case manager was

22   incorrectly classified by SSC as "exempt." (SAC, Doc. 27, ¶¶ 12, 13.)

23   According to Plaintiff, SSC employs a "fleet of employees" like Plaintiff in "intake/outreach

24   employee positions" which are all mis-classified as exempt. (SAC, Doc. 27, ¶ 7.) Plaintiff alleges

25   

26   [2] Social Service Coordinators, LLC was originally Social Service Coordinators, Inc. However, SSC changed
corporate forms on December 28, 2010. (SAC, Doc. 27, ¶ 8.) Thus, both entities have been listed as defendants, but

27   Plaintiff alleges they are one in the same, and SSC does not challenge this assertion. (SAC, Doc. 27, ¶ 8.) Thus,
references to "SSC" encompass both Social Service Coordinators, LLC and Social Service Coordinators, Inc. for

28   purposes of these findings and recommendations.

that SSC intentionally and deliberately created a number of job titles "to create the superficial appearance of a number of unique jobs, when in fact, these jobs are substantially similar and can be easily grouped together for the purpose of determining whether they were all misclassified." (SAC, Doc. 27, ¶ 7.) Plaintiff alleges that, because of this mis-classification, Defendant has refused to pay these employees overtime compensation and other benefits required by law.  (SAC, Doc. 27, ¶ 1.)

### III.   DISCUSSION

#### A.    Legal Standard

Under the FLSA, complaining employees may bring a collective action on behalf of themselves and all others "similarly situated."  29 U.S.C. § 216(b) (2012).  Plaintiffs must affirmatively "opt-in" by filing a written consent with the court, but are not subject to the more stringent requirements of class actions pursuant to Fed. R. Civ. P. 23. *See id.*; *Lewis v. Wells Fargo & Co.*, 669 F. Supp. 2d 1124, 1127 (N.D. Cal 2009).  The FLSA does not define "similarly situated," and there are several different approaches to interpreting the term.  District courts in the Ninth Circuit have adopted an *ad hoc*, two-tiered approach to determine whether plaintiffs are "similarly situated."  *See Kress v. PricewaterhouseCoopers, LLP*, 263 F.R.D. 623, 627 n.3 (E.D. Cal. 2009) (collecting cases).

The first tier is the "notice" stage, when the court determines whether plaintiffs are sufficiently similarly situated that the collective action should be certified for the purpose of sending notice to potential class members.  *Id.* at 627; *Gerlach v. Wells Fargo & Co.*, No. C 05-0585, 2006 WL 824652, at *2 (N.D. Cal. Mar. 28, 2006).  This threshold determination "requires little more than substantial allegations, supported by declarations or discovery, that 'the putative class members were together the victims of a single decision, policy, or plan.'"  *Gerlach*, 2006 WL 824652, at *2 (quoting *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1102 (11th Cir. 2001)).  The standard is a lenient one, typically resulting in a "conditional certification" of the representative class which may be revisited at the second stage.  *Wynn v. Nat'l Broad. Co.*, 234 F. Supp. 2d 1067, 1082 (C.D. Cal 2002) (quoting *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1214 (5th Cir. 1995)).

The second stage occurs at the conclusion of discovery, usually on a defendant's motion for decertification, and applies a stricter standard for "similarly situated."  *Gerlach*, 2006 WL 824652,

1  at *2.  Factors considered at the second stage include "(1) the disparate factual and employment

2  settings of the individual plaintiffs; (2) the various defenses available to the defendants with respect

3  to the individual plaintiffs; and (3) fairness and procedural considerations." *Leuthold v. Destination*

4  *Am.*, 224 F.R.D. 462, 467 (N.D. Cal. 2004).

5  **B.    The Parties' Arguments**

6      **1.    Plaintiff's Motion for Conditional Class Certification**

7      The FLSA provides that a non-exempt employee who works in excess of forty hours in one

8  week shall be paid "not less than one and one-half times the regular rate of pay at which he is

9  employed." 20 U.S.C. § 207(a)(1).  Plaintiff's complaint alleges SSC intentionally and wilfully mis-

10  classified certain positions in the company as "exempt."  Plaintiff contends that her position, and

11  positions like hers, should have been classified as "non-exempt" and, as a result, SSC should have

12  paid her overtime under Section 207(a)(1).

13      Although SSC has many departments and divisions, at issue here are employees who work

14  in two sub-divisions of the Operations and Outreach division:  the "Intake and GT" sub-division and

15  the "Medicare Outreach" sub-division.  (Doc. 52, 7:7-13.)[3]  Plaintiff contends that the proposed

16  collective class members share in common that they are non-executive employees working within

17  these sub-divisions, who were classified by SSC as "exempt" from overtime pay. (Doc. 52, 7:13-15.)

18  Plaintiff wishes to conditionally certify "outreach" and "intake" employees "who essentially were

19  telemarketers working in one of these two sub-divisions."  (Doc. 52, 7:15-18.)

20      Plaintiff claims that the individuals in these sub-divisions can be easily grouped together for

21  purposes of determining whether they were mis-classified because the jobs in the sub-divisions

22  involved substantially similar duties, regardless of job title.  Plaintiff asserts that employees in these

23  sub-divisions "sat in front of a computer, and often wore a telephone headset.  These employees'

24  _____

25      [3] Plaintiff's motion was originally filed at docket number 47, but it contained several redactions due to a pending motion to seal.  Plaintiff's motion to seal was granted in part, and a second copy of the motion was filed at docket number

26  52, containing redactions commensurate with the Court's order on Plaintiff's motion to seal.  It is the second version of Plaintiff's memorandum of points and authorities filed at docket number 52 that the Court will reference for purposes of the motion.  An un-redacted version of Plaintiff's memorandum is filed under seal at docket number 55.

27

28      References to page numbers of the parties' briefs or other documents in the record reflect citation to the CM/ECF pagination at the top of the filed documents.

primary job duties and responsibilities were, and continue to be, uniform: performing intake and outreach services to SSC's members . . . . Intake/outreach employees spent their day making outbound telephone calls to pre-determined or pre-qualified clients regarding their potential participation in medicare plans or programs." (Doc. 52, 10:14-21.)  Plaintiff maintains that all of SSC's "intake/outreach" employees would adhere to the written scripts provided by SSC, and "spent the vast majority of their workday on the phone conducting outreach, via-telephone calls, to potential applicants." (Doc. 52, 11:28-12:1; 12:13-14.)  The remainder of these outreach employees' day was spent filling out forms, entering information into SSC's database, and ensuring that the proper materials were mailed to the medicare program applicant.

Plaintiff claims that SSC maintained quotas regarding the status of each case that employees in the two sub-divisions handled, and categorized each case as "in progress," "pending," and "approved." (Doc. 52, 12:24.)  The quotas dictated a specific amount of time per day that intake/outreach employees were to spend following-up and working on "in progress" cases, including via outbound calls. (Doc. 52, 12:25-26.)  The quotas were extremely high and virtually impossible to achieve without working overtime. (Doc. 52, 13:10-11.)  All the SSC intake/outreach employees were under constant supervision by management. (Doc. 52, 13:16.)  According to Plaintiff, in performing their job duties, SSC intake/outreach employees did not use any independent discretion, judgment, or management decisions with respect to matters of significance.  "Each of those job categories [was] under close supervision by a SSC manager, performed outreach services, made calls from a per-determined list, operated according to SSC's written scripts and guidelines, and had to meet quotas." (Doc. 52, 13:21-23.)

Plaintiff contends that she is similarly situated with the rest of the proposed class because (1) everyone was designated as exempt; and (2) all the conditional class members worked over 40 hours, but were never paid overtime.  Although Plaintiff asserts that these facts alone support conditional class certification, (Doc. 52, 19:3-13), Plaintiff provides more by presenting some evidence that the prospective class members share similar job duties.  (Doc. 52, 19:17-21:2.) Plaintiff claims that members of the two sub-divisions share an essential function: they "regularly

1   reach out to SSC clients/customers to gather information and/or then filling-out/submitting a

2   predetermined set of forms related to government-sponsored programs." (Doc. 52, 20:5-8.) Plaintiff

3   asserts that sub-division membership is the "glue that binds everyone in this conditional class and

4   makes collective treatment particularly appropriate." (Doc. 52, 20:8-9.) In short, all of the members

5   of the proposed class were part of the process of making contact with pre-determined

6   clients/members, and then filing out and "pushing through" the various forms mandated by SSC's

7   process.

8       Plaintiff also contends that the class is similarly situated because all class members were

9   strictly controlled and regulated by SSC through statutory requirements, lists, scripts, checklists,

10  training materials, and strict quotas. (Doc. 52, 21:6-13.)

11      **2.      SSC's Opposition to Plaintiff's Motion for Conditional Certification**

12      SSC argues that Plaintiff has not filed an opt-in consent for purposes of initiating a collective

13  action pursuant to 29 U.S.C. § 216(b), and thus the action has not been properly commenced and the

14  motion cannot be granted as a procedural matter. (Doc. 51, p. 7-8.) SSC next argues that Plaintiff's

15  proposed class, drawn based on SSC's grouping of certain positions in two sub-divisions of the

16  company, is so broad and generic that it "precludes a meaningful analysis of 'who' is alleged similarly

17  situated to Plaintiff." (Doc. 51, p. 9.) SSC asserts that Plaintiff fails to show how different job titles

18  within the sub-divisions have the same duties and together were the victims of an improper single

19  decision, policy or plan. (Doc. 51, p. 10.) Further, the fact that job titles are organized by sub-

20  divisions does not mean that every position within a particular sub-division requires the same

21  primary duties.

22      SSC also contends that, even to the extent that Plaintiff has adequately identified job titles

23  and duties within the sub-divisions, the evidence offered does not show that there is a similarity

24  between the job duties of the putative class. (Doc. 51, p. 11-19.) SSC notes that no other individual

25  of the proposed class has filed a consent to opt-in to this case, which the Court should consider at

26  this stage. (Doc. 51, p. 11-12.) SSC argues that the declarations Plaintiff submitted in support of

27  the motion are nearly identical and speculative in nature, contain boilerplate and legal conclusions,

28  and often discuss matters as to which the declarants have no firsthand knowledge. (Doc. 51, p. 12-

6

13.)  Further, Plaintiff improperly attempts to rely upon membership in a company sub-divisions to establish that she and others are similarly situated; however, membership in a sub-division is not a "job function."  (Doc. 51, p. 14.)  Plaintiff offers no meaningful analysis of the specific job duties and titles within the two relevant divisions.  (Doc. 51, p. 15.)  The job descriptions of positions within the sub-divisions are different, and Plaintiff's discussion of the various positions exemplifies the lack of similarities in the job duties among employees in these divisions.  (Doc. 51, p. 15-16.)

According to SSC, although Plaintiff argues that every employee in the proposed class used the same training materials as evidenced by Plaintiff's submission of some of SSC's training materials, there is no showing that the entire putative class across the two sub-divisions received and used the same training materials, attended the same trainings, or was governed by the same quotas. Instead, Plaintiff simply asserts that it is true.  (Doc. 51, p. 17 ("There is no evidence as to *who* these materials and trainings may have applied, *when* they applied, and *how* they applied or *who* provided them.").)  Even the declarants who stated that SSC maintained quotas for outbound calls are "non-committal" as to whether everyone had the *same* quotas.  (Doc. 51, p. 17-18.)

SSC further contends that Plaintiff has also failed to identify a company-wide policy or decision common to all the putative class members.  The mere fact that Plaintiff alleges that these employees were mis-classified is not sufficient to establish a company-wide policy or decision common to all.  (Doc. 51, p. 19-21.)  Finally, SSC asserts that there are too many individualized issues among class members for a collective action to be maintained.  For example, SSC intends to assert an administrative exemption defense with respect to Remote Case Managers.  (Doc. 51, p. 21.) This exemption requires a highly individualized factual inquiry that will not be common to every class member.  As it relates to every employee in these sub-divisions, collective treatment is "even less plausible."  (Doc. 51, p. 22.)

Finally, SSC contends that, even to the extent the Court authorizes notice, the parties should negotiate the terms of the notice proposed by Plaintiff.  Specifically, the notice fails to address several issues that need to be resolved, including how Plaintiff's counsel will maintain the confidentiality of the putative plaintiffs' contact information, (Doc. 51, p. 25), and the parties should also meet and confer regarding the length of the notice period.  (Doc. 51, p. 26-27.)

3.     **Plaintiff's Reply**

Plaintiff contends that SSC ignores the lenient standard that is applicable at this notice-stage of the proceedings, as indicated by SSC's repeated statements that Plaintiff's evidence does not constitute "substantial evidence." Plaintiff notes that the standard at the notice-stage of the proceedings requires only allegations and "some" evidence. (Doc. 59, 6:22-24.)

Plaintiff asserts that she filed an express consent to suit with her original complaint and each of her amended complaints; thus, SSC is mistaken in its argument that the suit has not been properly commenced. (Doc. 59, 7:11, n. 3.) As to the proposed class, in light of an affidavit from SSC's Human Resource Director that all positions within the Intake and GT sub-division are "non-exempt" (Doc. 51-1, ¶ 18), Plaintiff narrows her proposed class to the following group:

> All current and former SSC employees working in the "Medicare Outreach" sub-division, who worked overtime, but were not classified as exempt, excluding anyone with the title of President, Vice President, Director, Supervisor, or Team Lead.

(Doc. 59, 16:14-16.)

Plaintiff maintains that all the employees within the Medicare Outreach sub-division have similar, even if not identical, primary duties. The proposed class members worked in a "cubical city call-center" making hundreds of calls to elderly applicants a day, "pushed and filled out forms provided by SSC, and operated according to strict training, quotas, scripts, and checklists." (Doc. 59, 5:10-13.) Putative class members who did not work in "cubicle city" had positions with the "exact duties," but they worked from home or "remotely" by logging into the same computer system as putative class members in the Florida call center, and used the same scripts, checklists, training, and federal and state eligibility criteria. (Doc. 59, 5:13-16.)

Other putative class members worked in the "field" doing the "exact same thing as their cubicle-bound counterparts," but they visited the elderly clients in person. (Doc. 59, 5:16-18.) These putative class members worked as "Field Coordinators" and did "just what everyone else did, but instead of using the telephone to market SSC's services and complete the rigid tasks, they used their cars and feet to reach elderly clients who were not as comfortable using the phone or internet." (Doc. 59, 5:18-20.) Further, Field Coordinators all used the same caller/client lists, scripts, quotas,

checklists, training protocols, and eligibility criteria. (Doc. 59:11:15-17.)  Thus, Plaintiff maintains that she has more than met the lenient standard required for notice of the collective action.

Finally, Plaintiff contends that SSC's arguments with regard to the notice to the class are "largely inappropriate attempts to limit participation by potential plaintiffs and to hinder plaintiffs' counsel's efforts to investigate the case on behalf of Ms. Davis."  (Doc. 59, 17:1-11.)

**C.     The Parties' Objections to Affidavits and Argument**

**1.     Plaintiff's Evidentiary Objections Should be OVERRULED**

In conjunction with her reply brief, Plaintiff filed objections to the affidavits of Cristina Pinckney ("Pinckney Aff.") (Doc. 51-1, Exh. A) and Minette Gomez ("Gomez Aff.") (Doc. 51-2, Exh. B) filed in support of SSC's opposition to Plaintiff's motion.  (Doc. 59-1.)  There are divergent opinions within the district courts regarding whether evidence submitted in support of or in opposition to a conditional class certification motion must be in a form admissible at trial. *Compare Harrison v. McDonald's Corp*., 411 F. Supp. 2d 862, 865-66 (S.D. Ohio 2005) ("[O]nly admissible evidence may be considered in connection with a [Section] 216(b) motion.") *with White v. MPW Industrial Servs.*, *Inc*., 236 F.R.D. 363, 368 (E.D. Tenn. 2006) (finding that hearsay evidence may properly be considered in the context of a motion for conditional class certification under Section 216(b)); *Aguayo v. Oldenkamp Trucking*, No. 04-6279-AWI-LJO, 2005 WL 2436447, at * 4 (E.D. Cal. Oct. 3, 2005) (disregarding hearsay and foundational challenges to declarations submitted in support of motion for conditional certification).

There are several reasons why the evidentiary standards should be relaxed at this stage of the proceedings, and Plaintiff's evidentiary objections should be disregarded.  First, this is a non-dispositive motion, and unlike a Rule 56 motion for summary judgment, there is no express requirement that the evidence considered be admissible for purposes of trial.  Second, by considering evidence at this stage, the Court is not making any binding determination as to the admissibility of evidence for purposes of trial. Many courts have relaxed the evidentiary requirements for plaintiffs at the conditional certification stage because the evidence has not been fully developed through discovery and the evidence will be subjected to greater scrutiny at the second stage.  Indeed, Plaintiff's declarations suffer similar foundational issues raised by SSC that are addressed below.

As the Court recommends that the evidentiary standards be relaxed with respect to Plaintiff's declarations, SSC's testimonial evidence will be viewed similarly.  More importantly, none of Ms. Pinckney's statements form the basis of the Court's recommendation to deny Plaintiff's motion.

Regarding Plaintiff's objection that Minette Gomez's statements lack foundation and contain inadmissible hearsay, the matters addressed in Ms. Gomez' affidavit do not pertain to Plaintiff's motion for conditional certification, but rather to contact Plaintiff's counsel had with a former employee of SSC and whether it involved a solicitation to join this lawsuit.  This issue was not briefed by either party, and the evidence is unrelated to the present motion.

For these reasons, Plaintiff's evidentiary objections to the affidavits of Cristina Pinckney and Minette Gomez should be OVERRULED.

**2.     SSC's Motion to Strike Portions of Plaintiff's Reply Brief Should be DENIED**

After Plaintiff filed her reply brief, SSC filed a motion to strike certain portions of Plaintiff's brief. (Doc. 60.)  SSC takes issue with Plaintiff's argument that SSC made a concession about similarities of the class by not offering evidence to "engage" Plaintiff's evidence (Doc. 60-1, ¶ 1.); SSC argues that Plaintiff unfairly characterizes SSC as having committed "discovery misconduct" (Doc. 60-1, ¶ 2.)  Finally, SSC asserts that Plaintiff's brief cites *Coyler v. SSC Disability Servs.*, No. 11-20984-CIV, 2012 WL 882500 (S.D. Fla. Mar. 14, 2012), and contends that Plaintiff misrepresents that this case involved SSC when in fact it involved "SSC Disability Services, LLC," a separate company (Doc. 60-1, ¶ 3).

As it relates to Plaintiff's statements in the reply brief as to whether SSC "conceded" arguments related to the putative class' uniform training and use of the same training materials, this is a disputed issue.  It is not appropriate to strike the matter from Plaintiff's reply brief simply because SSC disagrees with Plaintiff's argument.  The motion to strike in this regard was nothing more than a sur-reply filed without leave of court.  SSC's motion to strike lines 1 through 13 on page 12 of Plaintiff's reply brief should be DENIED.

Regarding Plaintiff's representation that SSC committed "discovery misconduct," the Court is well aware of the discovery disputes between the parties, particularly since the undersigned assisted the parties informally in resolving one of their disputes.  The discovery in this case was

bifurcated on a class certification/merits basis, and the parties disputed the scope of the initial discovery.

A review of the parties' briefs reveals that the parties still hotly contest the scope of the initial pre-certification discovery – SSC appears to maintain that Plaintiff was unfairly fishing in discovery and Plaintiff asserts that SSC was improperly blocking its attempts to obtain class discovery. Plaintiff is entitled to her opinion about SSC's discovery conduct, and the Court is capable of assessing the parties' discovery conduct. Although SSC's desire to respond to Plaintiff's argument may be understandable, it does not provide a basis to strike Plaintiff's reference to "discovery misconduct" in her reply brief. SSC's motion to strike footnote 6 on page 8 of Plaintiff's reply brief should be DENIED.

Finally, with respect to Plaintiff's citation to *Colyer v. SSC Disability Servs., LLC*, No. 11-20984-CIV, 2012 WL 882500 (S.D. Fla. Mar. 14, 2012), there is no need to strike Plaintiff's discussion of the case on the ground that Plaintiff has mis-characterized the facts and allegedly draws improper comparisons to the matters before this Court. The Court can independently decide whether Plaintiff's view of the case is persuasive and whether the case has been fairly and accurately characterized.

As SSC's objections to Plaintiff's reply brief do not provide a basis to strike any portion of the brief, the objections should be OVERRULED and the motion should be DENIED.

**D.    Plaintiff Has Not Provided Evidence that She is Similarly Situated to All Exempt Employees (excluding managers and supervisors) in the Medicare Outreach Sub-Division**

The parties do not dispute that Plaintiff's motion is one for conditional class certification, and that the more lenient first-stage notice standard applies. The notice standard requires plaintiffs to provide "substantial allegations, supported by declarations or discovery, that 'the putative class members were together the victims of a single decision, policy, or plan.'" *Gerlach*, 2006 WL 824652, at *3-4 (N.D. Cal. Mar. 28, 2006). In mis-classification cases, courts generally require plaintiffs "to provide some further allegation or evidence indicating that prospective class members share similar job duties." *Kress*, 263 F.R.D. at 629-30. This is so because whether employees are entitled to overtime compensation under the FLSA depends on an individual, fact-specific analysis

1    of each employee's job responsibilities under the relevant statutory exemption criteria.  *Holt v. Rite*

2    *Aid Corp*., 333 F. Supp. 2d 1265, 1271 (M.D. Ala. 2004) (quoting *Morisky v. Public Serv. Elec. &*

3    *Gas Co.*, 111 F. Supp. 2d 493, 498 (D.N.J. 2000)).  Thus, a collective action can only be maintained

4    where the class is similarly situated and was subject to a common policy or plan in a way that turns

5    individual factual inquiries into an issue that is common to the entire class and can be resolved with

6    common evidence.  *See Aquirre v. SBC Comm's Inc.*, No. CIV. A. H-05-3198, 2006 WL 964554,

7    at *12 (S.D. Tex. Apr. 11, 2006) (holding that to determine whether employees are similarly situated

8    in a mis-classification case, the court must consider employees' duties, amount of time spent on those

9    duties, and the extent of the discretion exercised).

10    Here, Plaintiff asserts that SSC violated the FLSA by mis-classifying its employees in the

11    Medical Outreach sub-division as "exempt" and failing to pay those employees overtime.  Plaintiff's

12    theory is that she and all proposed class members "did not utilize any independent discretion,

13    judgment, or management decisions with respect to matters of significance. [] Each of those job

14    categories were under close supervision by a SSC manager, performed outreach services, made calls

15    from a pre-determined list, operating according to SSC's written scripts and guidelines, and had to

16    meet quotas."  (Doc. 52, 13:19-23.)  As discussed by the court in *Kress*, the question at issue for

17    purposes of conditional class certification is whether Plaintiff's evidence indicates that the propriety

18    of the exempt classification may be determined on a collective basis, and not merely whether the

19    alleged mis-classification affected all the proposed class members.  *Id.* at 630.

**1.    Putative Class Members are Not Similarly Situated Merely Because They Are Grouped in the Medicare-Outreach Sub-division**

22    Plaintiff asserts in her motion that the proposed class members are similarly situated in terms

23    of job duties, at least in part, by virtue of their membership in the Medical Outreach sub-division:

> Ms. Davis and her fellow class members share an essential job function:  they are all part of (one of many) divisions within SSC:  "Outreach and Operations"  Moreover, they were all part of either the "Medicare Intake & GT" or "Medicare Outreach" subdivisions.  Their shared essential function is regularly reaching out to SSC client/customers to gather information and/or then filling-out/submitting a predetermined set of forms related to government-sponsored programs.  This subdivision-membership is a glue that binds everyone in this conditional class and makes collective treatment particularly appropriate.

(Doc. 52, 20:3-9.)

To the extent that Plaintiff contends that membership in the Medicare Outreach sub-division alone is sufficient to render similar all the employees' primary job duties, this argument is not persuasive. (*See* Doc. 52, 20, 3-9; Doc. 59, 10:1-2 ("The sub-division title ties these employees to one another for purposes of the notice stage . . . "). Even if all employees in the Medicare Outreach sub-division are working toward the same goal or the same end result, i.e., to process client applications for government programs, it cannot be inferred that their primary duties in doing so were necessarily similar or that common evidence would be used to prove that they were mis-classified. There must be "further allegations" supported by some evidence that the proposed class members in the Medicare Outreach sub-division share similar, although not necessarily identical, primary job duties. *See Kress*, 263 F.R.D. at 629-30 (where a case involves a claim of mis-classification, courts usually require plaintiffs to "provide some further allegations or evidence indicating that prospective class members share similar job duties").

### 2. Plaintiff Has Provided Some Evidence that She is Similarly Situated to Other Putative Class Members Who Conducted Client/Member Outreach Services Within the Medicare Outreach Sub-Division

Plaintiff asserts that the class members shared an essential function by "regularly reaching out to SSC clients/customers to gather information and/or then filling-out/submitting a predetermined set of forms related to government-sponsored programs." (Doc. 52, 20:5-8.) Each potential class member "focused on contacting SSC clients/members, interviewing them, and then filling out forms." (Doc. 52, 20:1-12.) "In short, members of the potential collective class were all part of the process of making contact with pre-determined clients/members, and then filling out and pushing through the various forms mandated by SSC's process (in turn determined by healthcare laws and set requirements)." (Doc. 52, 20:23-21:2.)

Further, Plaintiff maintains that all of the proposed class members were strictly controlled and regulated in their job duties by statutory requirements, lists, scripts, checklists, and strict quotas. (Doc. 52, 21:3-5.) For example, all of the collective class' calls were made from a pre-determined list mandated by SSC. (Doc. 52, 21:6.) Once calls were placed, during the entire process, all of the "intake/outreach" employees would adhere to written policies, including scripts, that were

implemented by SSC.  (Doc. 52, 21:7-9.)  All the employees in the class were guided by an Employment Manual or "Handbook." (Doc. 52, 21:9-10.)  Proposed class members were provided written checklists to determine whether a client member met the applicable state's requirements for program enrollment; once the application was completed, it was sent to a Case Reviewer who would determine whether the application met all the requirements or whether additional information was needed. (Doc. 52, 21:19-23.)  Proposed class members were also required to adhere to strict quotas. (Doc. 52, 21:24.)  According to Plaintiff, the quotas dictated a specific amount of time per day intake/outreach employees were to spend following-up and working on "in progress" cases via outbound calls.  (Doc. 52, 21:24-25:1.)  If these employees did not reach their quotas, they were routinely reprimanded by their supervisors.

Specifically, Plaintiff has identified the following exempt job titles in the Medicare Outreach sub-division whose primary job duties Plaintiff claims are similar to her own duties as a Remote Case Manager: other Remote Case Managers, Follow-Up Specialists, Eligibility Counselors I and II; Case Managers, Field Coordinators, and Case Reviewers.  As discussed below, with the exception of "Case Reviewers," Plaintiff has provided substantial allegations supported by some evidence that the job duties of these positions were sufficiently similar at the notice stage.

### a.    Remote Case Manager and Field Coordinator Positions

According to SSC's job description, Plaintiff's "Remote Case Manager" position is summarized as follows:

> This position (Remote Case Manager) works from their own home, conducting telephonic outreach services to low-income Medicare beneficiaries enrolled in a contracted Medicare Advantage health plan.  The Remote Case Manger will assist these members apply for Medicaid programs, including but not limited to the Medicare Savings Programs.

(Doc. 54, Tomasevic Decl., Exh. 4, p. 19-20.)  The essential responsibilities of this position include, among other things, conducting telephonic outreach activities, meeting quality standards by ensuring proper phone etiquette, adhering to scripts, meeting daily, weekly, and monthly production goals, and adhering to strict compliance of all aspects of SSC's outreach operations.  (Doc. 54, Tomasevic Decl., Exh. 4, p. 19.)  Along with her own declaration, Plaintiff submitted the declarations of three other SSC employees who performed work as "Remote Case Managers." (Doc. 47-4, Davis Decl.;

Doc. 47-10, Goss Decl.; Doc. 47-11, Barron Decl.; Doc. 47-12, Rivers Decl.)[4] Each Remote Case Manager states that she worked full-time from her home and was not physically located at SSC's call-center in Florida, and that her primary duty was making outbound telephone calls to pre-determined or pre-qualified clients regarding their potential participation in Medicare plans or programs. (Doc. 47-4, Davis Decl., ¶¶ 2-3; Doc. 47-10, Goss Decl., ¶¶ 2-3; Doc. 47-11, Barron Decl., ¶¶ 2-3; 47-12, Rivers Decl., ¶¶ 2-3.) All four Remote Case Managers also state that they called SSC clients from a computer-generated list of people, which was provided by SSC (Doc. 47-4, Davis Decl., ¶ 3; Doc. 47-10, Goss Decl., ¶ 3; Doc. 47-11, Barron Decl., ¶ 3; 47-12, Rivers Decl., ¶ 3); none could recall ever calling someone who was not on a pre-determined list or transferred from a co-worker; (Doc. 47-4, Davis Decl., ¶ 3; Doc. 47-10, Goss Decl., ¶ 3; Doc. 47-11, Barron Decl., ¶ 3; 47-12, Rivers Decl., ¶ 3);

The Remote Case Managers state they were under the close supervision of an SSC manager, made calls from a pre-determined list, and operated according to SSC's written scripts and guidelines. (Doc. 47-4, Davis Decl., ¶ 11; Doc. 47-10, Goss Decl., ¶ 12; Doc. 47-11, Barron Decl., ¶ 12; Doc. 47-12, Rivers Decl., ¶ 12). Each Remote Case Manager had a quota of outbound calls requiring a specific amount of time per day that was to be spent making calls and dictated an average talk-time per call; (Doc. 47-4, Davis Decl., ¶ 8; Doc. 47-10, Goss Decl., ¶ 8; Doc. 47-11, Barron Decl., ¶ 8; 47-12, Rivers Decl., ¶ 8); and had monthly quotas, and was reprimanded by her superiors at SSC if she did not meet the call-time quotas (Doc. 47-4, Davis Decl., ¶ 8; Doc. 47-10, Goss Decl., ¶ 8; Doc. 47-11, Barron Decl., ¶ 8; 47-12, Rivers Decl., ¶ 8). All the Remote Case Managers viewed the quotas SSC set to be high and virtually impossible to achieve without working overtime. (Doc. 47-4, Davis Decl., ¶ 8; Doc. 47-10, Goss Decl., ¶¶ 9-10; Doc. 47-11, Barron Decl., ¶ 9; Doc. 47-12, Rivers Decl., ¶ 9.) They were compensated on a salary basis, routinely worked in excess of 40 hours, but were not paid overtime. (Doc. 47-4, Davis Decl., ¶ 14; Doc. 47-10, Goss Decl., ¶ 14; Doc. 47-11, Barron Decl., ¶ 14; Doc. 47-12, Rivers Decl., ¶ 14).

---

[4] The docket text entry at Doc. 47-4 lists the declarant as "Katie Gross," but the declaration itself was submitted and signed by "Kristie Goss."

Two declarants, Kristie Goss and Natalie Rivers, indicated that they also performed work for SSC in the position of "Field Coordinator." As a Field Coordinator, they each completed the same tasks as a Remote Case Manager, but as Field Coordinators, they were also required to meet with clients face to face. (Doc. 47-10, Goss Decl., ¶ 1; Doc. 47-12, Rivers Decl., ¶ 1.)

### b.      Case Manager Position

The job title Case Manager held very similar duties as that of a Remote Case Manager, and SSC's job description summarizes those duties as follows:

> This position holds accountability for conducting telephonic outreach services and assisting low-income Medicare beneficiaries enrolled in a contracted Managed Care Organization Medicare+Choice health plan, with the qualification and application process for Medicare Savings Programs.

(Doc. 54, Tomasevic Decl., Exh. 4, p. 27.) The job description provides "essential responsibilities" which included, among other things, conducting telephonic outreach activities for initial and follow-up contact, including analysis and assessment of state Medicaid eligibility criteria into Medicare Savings Programs, meeting daily, weekly, and monthly production goals, meeting quality standards by ensuring phone etiquette and adherence to scripts, and adhering to strict compliance of all aspects of SSC's Outreach Operations. (Doc. 54, Tomasevic Decl., Exh. 4, p. 27.)

Plaintiff submitted declarations from seven SSC Case Managers describing their primary job duties while employed as Case Managers. (Doc. 47-5, Smith-Martin Decl.; Doc. 47-6, Jean-Louis Decl.; Doc. 47-7, Bach Decl.; Doc. 47-8, Dixon Decl.; Doc. 47-9 De La Hoz Decl.; Doc. 47-13, Aguila Decl.; Doc. 47-14 Salehi Decl.) The Case Managers uniformly state that they worked in that position at SSC's facility located near Miami Lakes, Florida, at an outreach call center, where they worked with and spoke to other SSC employees in the same facility.   (Doc. 47-5, Smith-Martin Decl. ¶ 2; Doc. 47-6, Jean-Louis Decl. ¶ 2; Doc. 47-7, Bach Decl. ¶ 2; Doc. 47-8, Dixon Decl. ¶ 2; Doc. 47-9 De La Hoz Decl. ¶ 2; Doc. 47-13, Aguila Decl. ¶ 2; Doc. 47-14 Salehi Decl. ¶ 2.) All of the Case Managers describe their primary duties as follows:

> my primary duty was making outbound telephone calls to pre-determined or pre-qualified clients regarding their potential participation in Medicare plans or programs. I called clients from a written list of people. That list was always provided to me by SSC. I cannot remember a time that, as part of my regular duties, I called someone who was *not* on this predetermined list or, on some occasions, transferred to me directly from a co-worker.

16

(Doc. 47-5, Smith-Martin Decl. ¶ 3; Doc. 47-6, Jean-Louis Decl. ¶ 3; Doc. 47-7, Bach Decl. ¶ 3; Doc. 47-8, Dixon Decl. ¶ 3; Doc. 47-9 De La Hoz Decl. ¶ 3; Doc. 47-13, Aguila Decl. ¶ 3; Doc. 47-14 Salehi Decl. ¶ 3.)   Additionally, all the Case Managers report spending the majority of their workday on the phone conducting outreach to potential Medicare applicants, and the remainder of their day filling out forms, entering information into SSC's database, and ensuring that proper materials were mailed to the medicare program applicant (Doc. 47-5, Smith-Martin Decl. ¶ 7; Doc. 47-6, Jean-Louis Decl. ¶ 7; Doc. 47-7, Bach Decl. ¶ 7; Doc. 47-8, Dixon Decl. ¶ 7; Doc. 47-9 De La Hoz Decl. ¶ 7; Doc. 47-13, Aguila Decl. ¶ 7; Doc. 47-14 Salehi Decl. ¶ 7.)   All the Case Managers report that SSC maintained quotas regarding the time spent making outbound calls as well as average talk-time per call, and that the quotas were unreasonably high and impossible to achieve without working overtime . (Doc. 47-5, Smith-Martin Decl. ¶¶ 8-9; Doc. 47-6, Jean-Louis Decl. ¶¶ 8-9; Doc. 47-7, Bach Decl. ¶¶ 8-9; Doc. 47-8, Dixon Decl. ¶¶ 8-9; Doc. 47-9 De La Hoz Decl. ¶¶ 8-9; Doc. 47-13, Aguila Decl. ¶¶ 8-9; Doc. 47-14 Salehi Decl. ¶¶ 8-9.)   The Case Managers further reported they were compensated on a salary basis, routinely worked more than 40 hours per week, but were not paid overtime.  (Doc. 47-5, Smith-Martin Decl. ¶ 13; Doc. 47-6, Jean-Louis Decl. ¶ 13; Doc. 47-7, Bach Decl. ¶ 14; Doc. 47-8, Dixon Decl. ¶ 13; Doc. 47-9 De La Hoz Decl. ¶ 13; Doc. 47-13, Aguila Decl. ¶ 16; Doc. 47-14 Salehi Decl. ¶ 13.)

### c.   Follow-Up Specialist Position

Plaintiff also identified the job title of "Follow-Up Specialist" as an exempt position within the Medicare Outreach sub-division.  The job duties of a Follow-Up Specialist are summarized in an SSC job description as follows:

> This position holds accountability for conducting telephonic outreach services and assisting low-income Medicare beneficiaries enrolled in a contracted Managed Care Organization Medicare+Choice health plan, with the qualification and application process for Medicare Savings Programs.

(Doc. 54, Tomasevic Decl., Exh. 4, p. 21.)  The "essential responsibilities" of the position include, among other things, conducting follow-up telephonic outreach activities, meeting daily, weekly, and monthly production goals, meet quality standards by ensuring proper phone etiquette and adherence

to scripts, and adhere to strict compliance of all aspects of SSC's Outreach Operations.  (Doc. 54, Tomasevic Decl., Exh. 4, p. 21.)

### d.     Eligibility Counselor I & II Positions

Plaintiff also identified two "Eligibility Counselor" exempt positions within the Medicare Outreach sub-division.  The "Eligibility Counselor I" position, an exempt job title within the Medicare Outreach sub-division, is described by SSC as follows:

> This position services to assist low-income Medicare beneficiaries enrolled in a contracted Managed Care Organization Medicare+Choice health plan, with the qualification and recertification process for Medicare Savings Programs.  The recertification team conducts telephonic outreach to remind, assist, and keep the members enrolled by either phone outreach or mailings.  This outreach is performed before and around the members['] recertification date.

(Doc. 54, Tomasevic Decl., Exh 4, p. 25.)  The essential responsibilities of this position include, among other things, conducting telephonic outreach for members who need to recertify or are eligible for Medicare Savings Programs, meeting daily, weekly, and monthly production goals; ensuring proper phone etiquette and adhering to scripts, and adhering to strict compliance of all aspects of SSC's Outreach Operations.  (Doc. 54, Tomasevic Decl., Exh. 4, p. 25.)

The position of Eligibility Counselor II is described as follows:

> This position is responsible for conducting telephonic outreach services to low-income Medicare beneficiaries enrolled in an SSC contracted Managed Care Organization Medicare+Choice health plan.  The Eligibility Counselor II makes outbound telephone calls and handles inbound telephone calls to assist M+C plan members who lost their Medicare Savings Programs (MSP) to reapply for the benefit.

(Doc. 54, Tomasevic Decl., Exh 4, p. 23.)  The essential job responsibilities include, among other things, meeting production and departmental goals by conducting telephonic outreach activities to already enrolled members, and adhering to strict compliance of all aspects of SSC's Outreach Operations.  (Doc. 54, Tomasevic Decl., Exh 4, p. 23.)

### e.     Conclusion

While the primary job duties of these employees may vary slightly,  Plaintiff asserts that they all exercised little discretion because it was SSC's policy to require them to use pre-generated call lists, scripts and checklists for conversations with members/clients, and maintain adherence to production quotas and "talk time" requirements.  As discussed in Section III(E)(4), *supra*, variations

in day to day duties or differences in the programs about which the employees contacted members, are not the type of differences that preclude notice to the proposed class at this stage. Plaintiff has sufficiently established that employees working at these exempt positions within the Medicare Outreach sub-division are similarly situated because there is some evidence that they share similar primary job duties.

3.      **There is No Evidence that Plaintiff is Similarly Situated to Case Reviewers**

a.      **Primary Job Duties Set Case Reviewers Apart from the Proposed Class**

Although Plaintiff has made a sufficient showing that she is similarly situated to those SSC employees who performed client/member outreach pursuant to scripts, call lists, quotas, and checklists, as discussed above, there is no evidence that Plaintiff is similarly situated to Case Reviewers, which is a position within the Medicare Outreach sub-division. For example, all of Plaintiff's declarants indicate that their primary job duties were to conduct telephonic or in-person outreach to clients through the use of pre-generated contact lists facilitated through scripts created by SSC to guide the interaction. Each declarant stated that SSC imposed such high quotas related to client outreach that they were forced to work overtime without compensation. Further, the job descriptions of the various positions within the Medicare Outreach sub-division include essential responsibilities such as conducting outreach to SSC's clients/members, meeting production goals or quotas, and adherence to scripts. (*See* Doc. 54, Tomasevic Decl., Exh. 4.)

The job description of a Case Reviewer, however, stands in contrast to that of the other enumerated positions in the Medicare Outreach sub-division:

> This position holds accountability for assembling the application packages after they have been received from the members, reviewing the application packages for completeness, notifying the Case Manager if additional follow-up is required, and submitting the completed application package to QA for final review before it is sent to the state.

(Doc. 54, Tomasevic Decl., Exh. 4, p. 29.) The essential job responsibilities include, among others, receiving and reviewing all incoming correspondence from members to determine completeness of the package and to determine if additional information is needed, notifying the Case Manager if additional followup is required; meeting quality standards by ensuring accurate and descriptive "MMS documentation" is made; adhering to strict compliance of all aspects of SSC's Outreach

1  Operations, and meeting "QA accuracy goal of 90% or higher on all submissions." (Doc. 54,
2  Tomasevic Decl., Exh. 4, p. 29.)

3      According to the evidence produced, a Case Reviewer's duties do not require any contact with
4  clients which sets this position apart from the primary job duties in other positions within the sub-
5  division.  The summary of a Case Reviewer's primary duties also does not include adherence to a
6  script, most likely because there is no noted client interaction.  With the exception of the Eligibility
7  Counselor II position (*see* Doc. 54, Tomasevic Decl., Exh. 4, p. 23), every other job description
8  included one essential responsibility that involved adherence to a script for interactions with the
9  clients.  There is also no requirement that a Case Reviewer maintain production goals or quotas, as
10  is required for the other enumerated exempt positions within the Medicare Outreach sub-division.
11  Finally, there is no evidence offered that Case Reviewers engaged in client outreach that would have
12  required "talk time"; instead, the Case Reviewer job description offered is some evidence that Case
13  Reviewers did not share the primary responsibilities of those employed in positions that required
14  conducting client outreach services.

15      At the July 18, 2012, hearing, Plaintiff contended that Case Reviewers are similar to the rest
16  of the class because they work in the same department and share the same goal as the other
17  employees in the sub-division – i.e., processing applications for Medicare programs.  Plaintiff also
18  indicated that, even if the job description did not reflect that Case Reviewers were required to
19  conduct client outreach, if Plaintiff were allowed to conduct discovery, she suspects she would find
20  that the job duties of a Case Reviewer does require client outreach.  There is no evidence that Case
21  Reviewers in fact contacted SSC members/clients, and Plaintiff's speculation about what she may
22  uncover in discovery is not sufficient to meet even the lenient standard at this notice stage in light
23  of the evidence produced indicating that Case Reviewers do not have similar primary job duties to
24  Plaintiff or other members in the proposed class.

25      Additionally, a common goal does not bind the class in terms of job duties.  For example,
26  sharing the same broad goal of processing client applications does not indicate a way in which
27  common evidence will show that the entire class was mis-classified.  Employees who worked in the
28  Quality Assurance unit and reviewed all the applications prior to submission to state agencies also

ostensibly shared the goal of processing applications for various programs (*see* Docs. 59-4, 65, Goss Decl., Exh. G  (describing quality assurance unit tasks) (sealed); however, those positions are not grouped in the Medicare Outreach sub-division according to SSC's organizational flow chart (*see* Doc. 54, Tomasevic Decl., Exh. I, p. 8), nor does Plaintiff assert that their job functions would be similar to the rest of the class.

Plaintiff asserts that the mere fact that the Case Reviewers did not perform client outreach does not merit excluding them from the class at this stage.  Plaintiff's argument, however, is not persuasive because the evidence to establish how the putative class similarly lacked discretion in their positions revolves around pre-generated call lists, scripts for interaction with clients, and quotas that dictated call-time, which prevented class members from exercising sufficient discretion or independent judgment to be classified as "exempt."  Additionally, not one of Plaintiff's declarants observed Case Reviewers performing job tasks similar to their own tasks, even though the declarants noted that they forwarded applications from members to the Case Reviewers.  In fact, one declarant characterized Case Reviewers as "internal auditors." (Doc. 47-9, De La Hoz Decl., ¶ 10.)  Plaintiff's theory that all the putative class members were essentially telemarketers underscores the lack of similarity in primary job functions between Case Reviewers and employees in the sub-division who conducted client outreach services.

Plaintiff correctly notes that differences in some job duties or titles are irrelevant if those differences do not affect the common evidence that will demonstrate that the entire group was mis-classified on a collective basis.  Plaintiff's brief repeatedly states the similarities of the class are predicated on the fact that they all: (1) were bound in everything they did by specific state or federal laws relating to Medicare; (2) made hundreds of calls to the same kinds of clients or made these contacts and presentations in person; (3) conducted their hundreds of calls or personal visits according to written scripts and checklists; (4) only made calls to those people that SSC told them to call or visit; (5) SSC placed them all in the same sub-division; (6) operated under the same detailed training, study guides and employee handbooks; (7) shared boilerplate written job descriptions that were not only similar, but in many instances, identical; and (8) adhered to strict quotas for things like talk time as well as how many files needed to be converted from in progress

to pending and complete. (*See* Doc. 59, 6:1-21.) According to the job description of a Case

Reviewer submitted by Plaintiff, most of the similarities noted above do not apply to that position.

       **b.**    **Evidence of Training Materials and Adherence to Federal and State Guidelines Does not Establish Similarity of Putative Class Members' Primary Job Duties**

Plaintiff argues that like *Kress,* all the employees in the Medicare Outreach sub-division were

required to follow the same state and federal requirements for completing Medicare program

applications and were thus required to follow the same protocol, analogous to the accountant class

that was certified for notice in *Kress*. Although Plaintiff urges the Court to apply *Kress*, critical

dissimilar facts render it an unsuitable analogy.

In *Kress*, the plaintiff sought to proceed on behalf of all persons who were employed as

"associates" in PricewaterhouseCoopers, LLP's ("PwC") Attest Division in the Assurance line of

business anywhere in the United States. 263 F.R.D. at 625. In asserting that the plaintiff and the

putative class members were similarly situated, the plaintiff argued that PwC's training, audit

methodology, and the applicable professional standards ensure that all Attest Associate's job duties

are similar in pertinent regards. *Id.* at 630. The court found this allegation was supported by some

evidence as PwC had a uniform audit methodology codified into an internet based Audit Guide, and

the plaintiffs submitted declarations and deposition testimony indicating that individual employees

adhered to this system. *Id.* at 630-31. Further, several declarants worked in multiple offices, and

stated that PwC's procedures were uniform across these offices. *Id.* at 631. Finally, under the

professional rules governing accountants, all putative class members were subject to a level of

supervision and there were several declarations describing the similar nature of this supervision. *Id.*

PwC conceded that the training, methodology, and professional standards were uniformly applicable.

*Id.* In combination with the uniform training, methodology, and professional standards, the court

noted that the nature of the supervision might allow for class wide determination as to whether

employees exercise discretion and independent judgment as required for the administrative

exemption. *Id.*

Here, in contrast, there is no *affirmative* concession from SSC that its training is uniform

across the Medicare Outreach sub-division or that the methodologies and protocol within the sub-

division are the same, regardless of primary job duties.[5]  Plaintiff maintains that employee training

is the same across the sub-division, but there is no supporting evidence that a standardized training

protocol applied uniformly to everyone in the sub-division.  Plaintiff's declaration states that the

training of Case Managers and Remote Case Managers was the same, not that all employees in the

entire sub-division underwent the same training.  (Doc. 59-4, Davis Decl., ¶ 5 ("Both [Remote Case

Manager and Case Manager] positions relied on the same training materials").  Accepting this

statement under relaxed evidentiary rules at the conditional stage, it indicates only that Remote Case

Managers and Case Managers used the same training materials, not that those materials applied

broadly to the entire sub-division.  Moreover, Plaintiff does not show how similar training materials

(*see* Doc. 56, Tomasevic Decl., Exh. 5 (sealed)) ensure that everyone in the sub-division was

"essentially a telemarketer" engaged in conducting client outreach in light of the disparate job

description of the Case Reviewer.

Finally, almost all of the documents provided by Plaintiff reference training for conducting

client outreach – a job duty not part of the Case Reviewer position.  (*See* Docs. 47-4, 53,[6] Davis

Decl., Exh. A (script used for making outbound calls) (sealed); Exh. B (document with objectives

in making outreach calls) (sealed); Exh. C (pre-printed form to be used to fill in required information

when making outbound calls) (sealed); Exh. D (e-mail etiquette document dictating how and when

email should be utilized to in conjunction with making outreach calls); Exh. E (document confirming

hardware sent to Plaintiff at her home to allow her to make outreach calls); Exh. F (diagram of how

---

[5] Plaintiff urges the Court to consider SSC's failure to provide evidence as to the dis-similarity of the putative class' training or training materials as a concession that all putative class members did in fact undergo the same training and utilized the same training materials. SSC asserts that it is not required to dispute Plaintiff's allegations with evidence of its own, and SSC in no way conceded this issue. SSC did address Plaintiff's allegation that the training materials were uniformly utilized by the putative class members in its brief, thus the Court does not find that the issue was conceded by SSC. As a practical matter, if a defendant were required to produce evidence to dispute every allegation by a plaintiff at this stage to avoid a concession, the notice stage would be transformed into an all-out evidentiary battle. A defendant is entitled to keep its full evidentiary powder dry without risk of concession until the second stage when discovery is complete, the burden typically shifts, and the standard is more stringent. In any event, an inference can be made that for employees who engaged in similar job duties, training materials produced by Plaintiff may have been utilized by those employees. However, the Court is not persuaded the training materials are evidence that the entire class performs similar primary duties.

[6] The sealed exhibits are located at Docket No. 57, and are not publicly available. The particular contents of those documents have not been revealed other than to reference the nature of the documents.

1   Remote Case Managers were synched with the online system); ¶ 25, Exh. G (performance review

2   used within the "Case Manager department").

3           As to Plaintiff's allegation that the putative class members were all required to adhere to state

4   and federal guidelines and laws for submitting applications, this argument is directed more to the

5   discretion of employees who performed similar job tasks in their jobs.  It does not tend to show that

6   all the positions within the Medicare sub-division dictated similar primary job responsibilities. In

7   other words, adherence to state and federal laws does not show that every employee in the proposed

8   class shared similar primary job duties.  Certainly employees in Quality Assurance who reviewed

9   the completed applications had to adhere to state and federal guidelines and laws to determine

10  whether the application met all the requirements, yet employees in that unit are not part of the

11  Medicare Outreach sub-division and Plaintiff does not argue that positions in the Quality Assurance

12  unit are similar to the proposed class.

13          In sum, the evidence does not tend to show that Case Reviewers performed any client

14  outreach, which was Plaintiff's primary job duty.  Most of the uniform policies that Plaintiff claims

15  stripped the class of any independent judgment or discretion related to scripted interactions with

16  clients/members from pre-generated contact lists and adherence to strict quotas.  According to the

17  evidence presented, these policies did not apply to Case Reviewers.  Thus, to the extent the proposed

18  class includes Case Reviewers, it is too broad.

19  **E.      Plaintiff Should Be Granted An Opportunity to Renew the Motion**

20          While the Court finds that Plaintiff's proposed class is over-broad, Plaintiff has offered more

21  than some evidence that employees within the Medicare Outreach department who performed

22  client/member outreach are similarly situated.  As set forth below, none of SSC's arguments would

23  preclude certification as to a slightly narrowed class, and Plaintiff should be provided an opportunity

24  to renew the motion and re-shape the class definition to exclude from the group dissimilar positions

25  such as that of Case Reviewers.

26

27

28

### 1.   Plaintiff Filed a Valid Consent With the Complaint and Second Amended Complaint

Defendant argues that Plaintiff and all other putative class members failed to file a written consent-to-suit; thus, the action has not been properly commenced under Section 216(b).  Plaintiff notes that her express consent to suit was filed as an exhibit to her complaint and her subsequent amended complaints; as such, she has sufficiently consented to the suit and commenced the action.  As indicated in the reply brief, each amended complaint, including the original complaint, contained an express written consent to suit signed by Plaintiff Lisa Davis.  (*See* Doc. 1, Exh. A, p. 50; Doc. 6, Exh. A, p. 50; Doc. 27, Exh. A, p. 36.)  At the July 18, 2012, hearing, Defendant conceded that Plaintiff has filed a consent to suit.  Thus, SSC's argument in this regard is moot.

### 2.   Lack of Other Opt-In Consent Does Not Preclude Notice

SSC asserts that, although Plaintiff has provided 10 declarations in addition to her own in support of her motion, none of these declarants has filed a consent to opt-in to this case, a factor to be considered at the conditional certification stage.  (Doc. 51, p. 11-12.)  While some courts have required a plaintiff to make an affirmative showing that there are other individuals who desire to opt-in to the case, several courts, including courts in this district, have rejected such a requirement for conditional certification.  *Gomez v. H&R Gunlund Ranches, Inc.*, No. CV F 10-1163-LJO-MJS, at *5 (E.D. Cal. Dec. 16, 2010).  In *Gomez*, the defendants argued that conditional certification is not available unless a plaintiff makes an affirmative showing that there are other individuals who desire to opt-in to the class.  *Id.*  The court rejected this argument noting that this additional requirement at the notice stage "has almost never been applied outside the Eleventh Circuit, and has never been applied in the Ninth Circuit."  *Id.*  The court concluded that the plaintiffs were not required to demonstrate other opt-in plaintiffs were interested in joining the case at the notice stage of the proceedings.  *Id.*

SSC offers no reasons why such a showing should be required in this case, or why the Court should depart from its prior determination in *Gomez*.  The lack of other consenting opt-in plaintiffs or a demonstrated interest by others in joining the suit is irrelevant at this stage of the proceedings.  *See Harris v. Vector Marketing Corp.*, 716 F. Supp. 2d 835, 839 (N.D. Cal. 2010) ("The fact that

other potential class members have not affirmatively stated a desire to opt in does not preclude conditional certification."); *Mowdy v. Beneto Bulk Transp.*, No. C 06-05682 MHP, 2008 WL 901546, at *7 (N.D. Cal. Mar. 31, 2008) (dismissing argument that plaintiffs must demonstrate opt-in interest prior to conditional certification, finding: "As a practical matter it would make little sense to require plaintiffs to have the knowledge they attempt to obtain by gaining approval of notice from the court."); *Hoffman v. Securitas Sec. Servs.*, No. CV 07-502-S-EJL, 2008 WL 5054684, at * 5 (D. Idaho Aug. 27, 2008) ("such a threshold requirement strikes this Court as contradictory to the very notion of providing *notice* to potential plaintiffs of the opportunity to become part of a collective action – what the FLSA expressly provides").

### 3. Plaintiff's Testimonial Evidence is Sufficient For Consideration at this Stage

SSC also argues that the declarations submitted by Plaintiff are too speculative and conclusory to constitute evidence sufficient to support conditional class certification.  (Doc. 51, p. 12.) Specifically, SSC targets the declarations filed by the Case Managers in which they indicate that they observed their primary duties were similar to other positions at SSC, including those of Remote Case Managers, Eligibility Counselors, and Field Coordinators.   Defendant notes that these statements are predicated only on the declarants' *beliefs*, and do not indicate how any declarant has personal knowledge of what work other employees performed in differing positions.  Further, a statement as to an individual's belief about the work performed by other employees is speculative.

SSC asserts that the declarations are "chock-full of boilerplate and legal conclusions."  For example, SSC notes that Natalie Rivers' declaration includes statements about the job duties of Case Managers, but does not set forth how she obtained first-hand information about the job duties of Case Managers.   SSC further contends that Rivers' statement about her lack of discretion in performing her work as a Remote Case Manager "suspiciously tracks the Code of Federal Regulations."  (Doc. 51, p. 14.)

"[A]t this stage, under a lenient standard, the use of similarly worded or even 'cookie cutter' declarations is not fatal to a motion to certify an FLSA collective action."  *Bollinger v. Residential Capital, LLC*, 761 F. Supp. 2d 1114, 1120 (W.D. Wash. 2011); *see also Labrie v. UPS Supply Chain Solutions, Inc.*, No. C08-3182 PJH, 2009 WL 723599, at *6 (N.D. Cal. Mar. 18, 2009) (determining

defendant's argument that plaintiffs' "identical, conclusory declarations" were not competent evidence as an argument going to the merits and more appropriately addressed on a motion to decertify or for summary judgment).  The fact that the declarations are very similar may implicate reliability issues, but that goes to the weight of the evidence which is better assessed at the second stage.

As it relates to SSC's concerns that the declarations contain speculative statements or make assertions that lack foundation, a plaintiff's evidence offered in support of a motion for conditional certification is generally not required to meet the same evidentiary standards applicable to summary judgment motions.  As discussed in *Fischer v. Michigan Bell Telephone Co.*, 665 F. Supp. 2d 819, 826 (E.D. Mich. 2009), "[b]ecause final disposition is not an issue at the conditional certification stage, requiring a plaintiff to present evidence in favor of a conditional certification that meets the hearsay standards of the Federal Rules of Evidence fails to [take] into account that the plaintiff has not yet been afforded an opportunity, through discovery, to test fully the factual basis of his case." (internal quotation marks and citations omitted).  SSC's contention that the declarations offered by Plaintiff do not constitute sufficient evidence because they are speculative, contain hearsay, or contain statements for which the declarant lacks personal knowledge, does not disqualify the evidence for purposes of establishing similar job duties among class members at the notice stage. *See Stickle v. SCI W. Market Support Center, L.P.*, No. 08-083-PHX-MHM, 2009 WL 3241790, at *5 (D. Ariz. Sept. 30, 2009) (rejecting defendants' argument that plaintiff's testimonial evidence in support of conditional class certification should be disregarded for containing statements that (1) lacked personal knowledge, (2) were hearsay, and (3) were conclusory, speculative, and unsupported personal beliefs about what other employees said or did).

In particular, SSC argues that several declarants made statements about the nature of work that other employees performed. Even to the extent the Court disregarded any statements from Plaintiff's declarants about the work performed by other employees due to lack of adequate foundation, this would not preclude Plaintiff's motion.  As a "Remote Case Manager" working from her home, Natalie Rivers may not have personal knowledge about work performed by Case Managers, and she does not set out the basis for her knowledge regarding the work duties of Case

Managers who worked at the Florida call center.  However, multiple Case Managers have provided statements regarding their job duties.  Further, as to Case Managers who testified that their duties were similar to Remote Case Managers, Eligibility Counselors, and Field Coordinators, even if those statements were disregarded for lack of foundation, Plaintiff has presented testimonial and non-testimonial evidence of the primary job duties of these positions.  Thus, even to the extent these statements were disregarded, it is not fatal to Plaintiff's motion.

> **4.    Some Difference Among Class Members Does Not Defeat Notice Certification**

The Court is not convinced that differences in some duties among putative class members who were primarily engaged in contacting SSC's members/clients, such as differences in the type of programs marketed to SSC's members, geographical locations of employees, differences in supervision, or differing quotas, are the types of distinctions that preclude notice at this stage.  *See Castillo v. P & R Enterp., Inc.*, 517 F. Supp. 2d 440, 446 (D.D.C. 2007) ("Although Defendant claims that employees cannot be similarly situated when they have 'different duties' and different 'job titles,' the putative class members are or were employed by Defendant to clean commercial real estate buildings in Washington, D.C. . . . The Court agrees with Plaintiff that '[t]he fact that some employees clean lobbies while others clean restrooms . . . is irrelevant.'").

These issues are more appropriately considered at the second stage when discovery has been completed.  For example, in *Gipson v. Southwestern Bell Telephone Co.*, the plaintiff sought to certify a class for notice that included all telephone dedicated customer service representatives at SWBT call centers that assist new or existing customers with activating or updating new accounts, assist with billing inquiries, and handle service or equipment issues.  No. 08-cv-2017 EFM/DJW, 2009 WL 10444941, at *3 ((D. Kan. Apr. 20, 2009).  The court held that "[v]ariations among actual job title or some responsibilities does not preclude notice stage certification where all employees share general duties and the defendant denies overtime pay to all."  *Id.*  The Court also determined that the defendant's concerns about disparate employment settings, organizational differences between call centers, and defenses particular to individual plaintiffs were more appropriately considered at the second stage.  *Id.*  Notably, the proposed class in *Gipson* was defined not simply by membership in a division of the company or by job title, but was built around a description of

primary job duties. Thus, the precise job title or the division of the company in which the employee worked were of little significance at the notice stage because the positions all shared some basic general duties.

### 5. Asserted Missing "Comparators" is Speculative and Does Not Preclude Notice

SSC argues that in proposing a class based on membership in sub-divisions within the company, Plaintiff fails to identify all the job titles within the particular division and the job duties associated with each title. Moreover, Plaintiff refers to the employees in these divisions as "intake/outreach" employees, "as if they held one title." (Doc. 51, p 9.) SSC maintains that this is "a fiction created by Plaintiff to describe a group of various jobs, which includes [Plaintiff's] position. No employee or group of employees has ever held the job title of 'intake/outreach employee.'" (Doc. 51, p. 9.) Without information about what job titles are encompassed in the sub-divisions, SSC argues it is impossible to evaluate whether all members of the proposed class are similarly situated and how common evidence will establish that all the employees' positions were mis-classified as "exempt." (Doc. 51, 9-10.)

Plaintiff counters that SSC does not cite a single case that requires Plaintiff to expressly "identify each and every job title that SSC happened to create. All that matters, instead, is whether or not there is some evidence that employees are "similarly situated" not that they, for instance, carry the same 'title.'" Plaintiff also essentially asserts that SSC's position in this regard is unfair to Plaintiff. Specifically, Plaintiff maintains in her reply brief as well as in argument during the July 18, 2012, hearing, that, had SSC provided the discovery that Plaintiff sought regarding job descriptions and a list of all job titles in the Medicare Outreach sub-division, Plaintiff would have all the information about employees' various job titles and duties. Plaintiff argues that for SSC to resist discovery about job titles by division of the company, and then assert that Plaintiff's motion does not provide evidence about the various job titles and duties within the division, is disingenuous.

Plaintiff's original motion sought notice certification as to employees in *two* sub-divisions ("Intake and GT" and "Medicare Outreach"), but the motion itself does not clearly delineate positions

within the "Intake and GT" sub-division that would be included in the class.[7] Plaintiff has narrowed the class to exclude any position in the "Intake and GT" sub-division.    Thus, as it relates to unidentified job titles within the "Intake and GT" sub-division, SSC's concerns are moot.  As it relates to all job titles within the Medicare Outreach sub-division, the job descriptions provided by Plaintiff in support of the motion clearly identified those position as part of the Medicare Outreach sub-division.  Plaintiff represented at the hearing that, to the best of her counsel's knowledge, all job titles within the sub-division have been identified in the motion and supporting materials; however, Plaintiff cannot definitively confirm this without a list from SSC of all exempt positions within the sub-division.

At the hearing, SSC's counsel was asked directly whether Plaintiff's motion accounted for every job title within the Medicare Outreach sub-division; SSC stated it could not definitively answer this question given the information available to SSC's counsel.  Thus, any argument that Plaintiff has not identified all exempt, non-supervisory positions within the Medicare Outreach sub-division is merely speculation.  Finally, any issue related to unidentified job titles within the Medicare Outreach sub-division can be cured.  For example,  in *Santiago v. Amdocs, Inc.*, No. C 10-4317 SI, 2011 WL 6372348, at * 5 (N.D. Cal. Dec. 19, 2011), the plaintiffs sought to certify a class of employees working in "job families" within a company.  Plaintiff narrowed the class definition to include a description of primary job duties of the class members after the defendant objected that the class was so broadly drawn by "job family" that it included positions that bore no resemblance to the jobs held by the plaintiffs.  *Id*. at * 5 n.5.  The narrowed class was found suitable for notice certification over defendant's objection that the class still included over 100 positions.  *Id.* at *6-7.

**6.      Plaintiff Has Sufficiently Alleged a Company-Wide, Decision, Policy, or Plan**

SSC argues that Plaintiff has shown no evidence to support her allegation of a company-wide decision, policy, or plan.  "Under the 'single decision, policy, or plan' standard, employees with disparate job functions may be similarly situated with respect to a FLSA claim where they are

---

[7] In her motion, Plaintiff refers to the sub-division as "GT and Intake," but SSC Human Resource director Cristina Pinckney, appears to refer to the sub-division as two separate divisions, the "Intake" and "GT" divisions. (*See* Doc. 51-1, Pinckney Decl., ¶ 18.)  SSC's Outreach & Operations organization charge references a "Medicare Intake & GT" sub-division.  (Doc. 54, Tomasevic Decl., Exh. 1, p. 8.)

uniformly subject to an allegedly wrongful policy." *Gee v. Suntrust Mortg., Inc.*, No. C-10-1509-RS, 2011 WL 722111, at \*3 (N.D. Cal. Feb. 18, 2011).  However, a mis-classification claim, standing alone is insufficient as a "single policy" warranting class treatment. *Id*.  As explained in *Kress*, taken literally, this would allow plaintiffs to receive conditional certification based purely on an allegation of mis-classification, no matter how disparate the job duties, which would vitiate the utility of a collective action.   However, where the class members share similar job duties, a uniform classification as exempt from overtime pay by the defendant may suffice at the notice stage. *See Lewis*, 669 F. Supp. 2d at 1128.  In *Lewis*, the plaintiff sought to certify a class of "technical support workers" with primary duties of installing, maintaining, and/or supporting software and/or hardware. *Id*. at 1126 n.2.   The court held that the plaintiffs met their burden of showing that all technical support workers were similarly situated and were together the victims of a single decision, policy, or plan by showing that they all shared a common job description, they were uniformly classified as exempt from overtime pay, and they performed similar job duties. *Id.* at 1128.

SSC's citation to *In re Wells Fargo Home Mortg. Overtime Pay Litig.* ("*Wells Fargo*"), 571 F.3d 953, 959 (9th Cir. 2009) echos the observations of *Gee* and *Kress* that an employer's blanket exemption policy in mis-classification cases "does nothing to facilitate common proof on otherwise individualized issues."[8]   The Ninth Circuit illustrated this concept by considering the federal outside salesperson exemption under 29 C.F.R. § 541.500(a). *Id*.  The court explained that the exemption application itself "will militate against certification" because it "requires a fact intensive inquiry" to determine whether each employee is customarily and regularly away from the employer's place of business. *Id.* However, if the employer had a centralized policy that required employees to be at their desks for 80% of their workday, this "would change the individual issue into a common one." *Id.*

---

[8] *Wells Fargo* was a review of class certification under Rule 23.  SSC also cites other cases that re-state the same proposition in a variety of procedural contexts. *Hernandez v. United Auto Credit Corp*., No. C-08-03404, 2010 WL 1337702, at \*7 (N.D. Cal. Apr. 2, 2010) (granting motion for decertification where actual duties performed by class members varied significantly, even though all were classified as exempt); *Morisky v. Pub. Serv. Elec. & Gas Co*., 111 F. Supp. 2d 493, 498 (D.N.J. 2000) (applying stricter second-stage standard to deny conditional certification); *Chemi v. Champion Mort.*, No. 05-cv-238-WHW-CCC, 2006 U.S. Dist. Lexis 100917, at \*6 (D.N.J. June 19, 2006).

Here, determining whether certain SSC employees exercised little discretion or independent judgment in their jobs such that they were mis-classified as "exempt" is necessarily an individual inquiry. However, if the employer had a policy of requiring every class member to meet a certain quota of hours of "talk time" or personal outreach to clients each day using a similar script for the interaction in a manner that afforded them little discretion, then the issue of discretion and the exercise of independent judgment becomes common to the class by virtue of the employer's policy, as explained in *Wells Fargo*. That is precisely the type of common, centralized policy that Plaintiff is asserting in this case – she is not relying exclusively on the mis-classification to support a collective action. Similarly, this is also what Plaintiff contends supports her theory that class members will rely on common evidence to establish the class was improperly classified.

**7.      Individualized Issues and SSC's Administrative Exemption Defense do not Preclude Conditional Certification**

SSC argues that it plans to assert defenses based on the administrative exemption, specifically as it relates to the group of employees with the title of "Remote Case Manager." SSC maintains that the exemption requires an individualized inquiry which will not be applicable to the entire putative class who worked in different positions. (Doc. 51, p. 21-22.)

The individualized nature of the administrative exemption defense does not undermine whether the putative class may be certified for notice. This argument has been raised numerous times by defendants who argue that the individualized nature of the determining the applicability of the exemption precludes notice certification, but it has been routinely rejected by district courts as a basis to deny conditional class certification. *See, e.g., Santiago v. Amdocs, Inc.*, 2011 WL 6372348, at *6 (collecting cases holding that arguments that exemption defenses require individualized inquiry go to the merits and are better addressed after discovery has closed in a motion to decertify the class or motion for summary judgment).

Notably, the case SSC cites for this proposition is *Pfohl v. Farmers Ins. Group*, No. 03-3080, 2004 WL 554834, at *9 (C.D. Cal. Mar. 1, 2004), which decertified a class based on whether each plaintiff met the administrative exemption because it necessitated individualized inquiries. The order in *Pfohl* was a second-stage decision made on a complete record after discovery had concluded.

As such, *Pfohl* provides no persuasive basis to find that these issues preclude notice certification at the first stage. It may well be that individualized issues and proof will preclude class treatment, but that is better left to the second-stage where a merits-based decision can be made on a complete record. *See Aguayo*, 2005 WL 243677, at *5-8 (motor carrier exemption defense did not preclude class certification at notice stage because exemption was a merits-based defense on which defendant bore the burden and could raise at the second stage).

The same is true of SSC's arguments related to each plaintiff's statute of limitations and employment periods; these issues are more appropriately considered at the second stage on a complete record. Issues regarding statute of limitations and employment periods are largely related to individual calculations of damages, not to whether there is a similar theory of liability. These individualized issues do not preclude notice certification at the first stage. *See Graham v. Overland Solutions, Inc.*, No. 10-cv-672-SEN (BLM), 2011 WL 1769737, at *2-3 (S.D. Cal. May 9, 2011) (disparate factual settings of the individual plaintiffs better resolved at the stricter second-stage on a complete record). SSC will have an opportunity to raise all of these arguments again at the second stage of the FLSA class certification process.

**8.    The Form and Content of the Notice**

Should Plaintiff propose a more narrowly drawn class, the Court will address the form and content of the notice at that time.

**9.    Conclusion**

Plaintiff has made a sufficient showing at this stage that she is similarly situated to some, if not most, of the employees in the Medicare Outreach sub-division. The standard for conditional certification, however, is not that Plaintiff show some evidence that she is similarly situated to *some* of the putative class, but that she provide some evidence that the entire class is similarly situated. As the Court finds that Plaintiff has sufficient evidence to conditionally certify a more narrowly drawn class, Plaintiff should be given leave to renew the motion for conditional certification to propose a class that addresses the issues discussed above. While it is within the scope of the Court's discretion to narrow the proposed class in a manner that is consistent with the purposes and requirements of the FLSA, *see, e.g., Baldridge v. SBC Commc'ns, Inc.*, 404 F.3d 930, 931-32 (5th

Cir. 2005) (noting court's discretion to modify scope of proposed FLSA class), there are at least two different ways in which the class could be re-shaped that would render it suitable for notice; thus, it should be left to Plaintiff to redraw the proposed class lines. Plaintiff should be granted 30-days to file a renewed motion for conditional class certification.

**F.      Plaintiff May Elect to Supplement the Motion During the Objection Period**

During the objection period, if Plaintiff elects to supplement her motion by proposing a slightly re-shaped class that addresses the concerns noted above, the Court will withdraw its findings and recommendations, permit SSC to file an opposition or otherwise respond to the supplemented motion, and reconsider the matter.

**IV.     CONCLUSION AND RECOMMENDATION**

For the reasons stated above, IT IS HEREBY RECOMMENDED that Plaintiff's motion for conditional class certification be DENIED WITHOUT PREJUDICE.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304. Within twenty-one (21) days of service of this recommendation, any party may file written objections to these findings and recommendations with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Responses to objections shall be filed, and served on all parties, within ten (10) days after service of the objections. The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the district judge's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:      August 27, 2012**                        **/s/ Sheila K. Oberto**
                                                           UNITED STATES MAGISTRATE JUDGE